AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
7/21/2022
CENTRAL DISTRICT OF CALIFORNIA
BY:     VAV      DEPUTY

| United States of America | |
|---|---|
| v. | Case No.   2:22-mj-02835-DUTY |
| ANTHONY BUZO, | |
| Defendant | |

FILED
CLERK, U.S. DISTRICT COURT

JUL 21 2022

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about July 19, 2022, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 8 USC § 1324(a)(1)(A)(ii) | Transporting Aliens Within the United States |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Ryan McMullen*
*Complainant's signature*

Ryan McMullen, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   7/21/2022

*Judge's signature*

City and state:  Los Angeles, California

Hon. Jacqueline Chooljian, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kathrynne Seiden (x0631)

**AFFIDAVIT**

I, Ryan McMullen, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against and arrest warrant for ANTHONY BUZO ("BUZO") for a violation of 8 U.S.C. § 1324(a)(1)(A)(ii) (transporting aliens within the United States).

2.    This affidavit is also made in support of an application for a warrant to search the following digital devices seized on July 19, 2022, in the custody of Homeland Security Investigations in Los Angeles, California (collectively the "TARGET DEVICES"), as described in Attachment A:

a.    A dark blue Samsung Galaxy S9 cell phone with an unknown serial number and an unknown IMEI number, seized from BUZO ("TARGET DEVICE 1").

b.    A blue cell phone with an unknown serial number, bearing IMEI numbers 351651901016779 and 351651901016787, seized from B.M.G. ("TARGET DEVICE 2").

c.    A purple ZTE cell phone with an unknown serial number and an unknown IMEI number, seized from E.G.F. ("TARGET DEVICE 3").

d.    A blue Samsung cell phone with an unknown serial number and an unknown IMEI number, with a Donald Duck case, seized from J.M.F. ("TARGET DEVICE 4").

1

     e.   A blue ZTE cell phone with an unknown serial number and an unknown IMEI number, seized from O.M.J. ("TARGET DEVICE 5").

     f.   A Green Redmi cell phone with an unknown serial number and an unknown IMEI number, seized from M.H.H. ("TARGET DEVICE 6").

    3.   The requested search warrant seeks authorization to search for and seize evidence, fruits, and instrumentalities of a violation of 8 U.S.C. §§ 1324(a)(1)(A)(i) (bringing aliens to the United States), 1324(a)(1)(A)(ii) (transporting aliens within the United States), 1324(a)(1)(A)(iii) (harboring aliens within the United States), 1324(a)(1)(A)(v) (conspiracy and aiding and abetting), 1324(a)(2) (bringing aliens to the United States for commercial advantage), and 1327 (aiding or assisting certain aliens to enter) (the "Target Offenses"), as described in Attachment B.  Attachments A and B are incorporated into this affidavit by reference.

    4.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.

    5.   This affidavit is intended to only show that there is probable cause for the requested complaint, arrest warrant, and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.

    6.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are

related in substance and in part only.  Further, all dates and amounts are approximations, and the words "on or about" and "approximately" are omitted for clarity.

## II.  **BACKGROUND OF AFFIANT**

7.    I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"), and have been so employed since August 2016.  I am currently assigned to the HSI Human Trafficking and Human Smuggling Group.  My responsibilities include investigating violations of federal law, including crimes involving human trafficking, human smuggling, money laundering, fraud, and immigration violations in the Central District of California.  Before I was assigned to the Human Trafficking/Human Smuggling Group in Los Angeles, I was assigned to the Border Enforcement Security Task Force Unit in the Western District of Texas, where I investigated human smuggling cases.

8.    During my tenure with HSI, I have conducted and participated in numerous criminal investigations, including investigations involving human trafficking, human smuggling, drug trafficking, and fraud. During these investigations, I have participated in the execution of search warrants, seized evidence, conducted arrests, and interviewed suspects and witnesses.

9.    I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia, where I completed the Basic Criminal Investigator Training Program and the HSI Special Agent Training Program.  I was previously employed with the Department

3

of Defense Counterintelligence and Security Agency as a Special
Agent from September 2010 until August 2016.

### III. SUMMARY OF PROBABLE CAUSE

10.  On July 19, 2022, in Compton, California, BUZO was
driving a stolen Amazon van when he was stopped by the Los
Angeles Sheriff's Department ("LASD").  In the back of the van
were five individuals who had no documented legal status to be
in the United States and who informed law enforcement that they
had crossed into the United States from Mexico earlier that day.
In a Mirandized interview, BUZO admitted that he knew there were
illegal aliens in the van and that he was being paid $5,000 to
transport the illegal aliens to a house in Compton, California.

### IV. STATEMENT OF PROBABLE CAUSE

**A.   Los Angeles Sheriff's Deputies Stop a Stolen Van**

11.  Based on my conversations with LASD personnel, I
understand the following:

a.   On July 19, 2022, at 6:15 p.m., in Compton,
California, LASD Deputy V. Dingillo was on patrol when she
conducted a records check of an Amazon utility van (the "Amazon
Van")[1] driving in front of her.  The records check indicated that
the Amazon Van had been reported stolen in Carson, California,
on July 8, 2022.  LASD Deputy Dingillo initiated a traffic stop
of the Amazon Van and ordered the driver, BUZO, and all the
passengers out of the van, pending a stolen vehicle

---

[1] I later learned that the Van was designed to look like an
Amazon van, but was not in fact one.

4

investigation.  BUZO and five passengers who had been seated on the floor in the back of the Amazon van exited the vehicle.

b.   LASD Deputy Dingillo read BUZO his Miranda rights and BUZO agreed to talk with LASD.  BUZO stated that he met someone on Instagram who told BUZO to pick up the Amazon Van in Santa Ana and take the Amazon Van to a location near Compton, California in exchange for $5,000 USD.  BUZO stated that he knew the van contained illegal immigrants, and that this was not the first time he had transported illegal immigrants in exchange for money.  BUZO denied knowing the Amazon Van was stolen.

c.   LASD contacted the owner of the Amazon Van and asked if he had given BUZO authorization to take or drive the Amazon Van.  The owner of the Amazon Van said he did not know BUZO and did not give BUZO authorization or consent to take his van.

d.   At approximately 8:30 p.m., LASD arrested BUZO for driving a vehicle without the owner's consent, in violation of California Vehicle Code § 10851(a), and transported BUZO to Century Regional Detention Facility in Lynwood, California ("Century Regional Facility").  LASD also seized Target Device 1 from BUZO during his arrest.

e.   The five adult male passengers told LASD they had come across the border illegally at approximately 6:00 a.m. that morning.  LASD transported the passengers to the LASD Compton Station ("Compton Station").

**B.   HSI Takes Custody of the Passengers**

12.   LASD contacted me about the encounter at around 7:02 p.m. on July 19, 2022.

13.   Based on my conversations with other HSI agents, I understand that at approximately 10:00 p.m., HSI agents arrived at the Compton Station and asked the five passengers for identification documents.  The only documents the passengers provided to the agents were Mexican voter identification documents.  HSI requested database record checks on all five passengers, which revealed that all five passengers were citizens and nationals of Mexico.  At approximately 11:00 p.m., HSI agents took custody of the five passengers and transported them to the San Clemente United States Border Patrol Station for further processing and investigation.

**C.   HSI Interviews BUZO**

14.   At approximately 10:21 p.m., HSI Special Agent Waldo Munguia and I arrived at the Century Regional Facility to interview BUZO.  Agent Munguia and I identified ourselves as HSI agents and read BUZO his Miranda rights.  BUZO signed a form indicating that he understood his rights and agreed to talk to us without an attorney present.

15.   BUZO told us that someone named "Arturo" contacted him by phone and instructed him to pick up a van loaded with "pollos" in Santa Ana, California and to drive it to a house in Compton, California, in exchange for $5,000 USD.  BUZO told us that he knew there would be passengers in the van who were here illegally and that he agreed to transport the illegal passengers

6

because he needed money to buy a car.  BUZO stated that "Arturo"
makes approximately $800 to $2,000 for each "pollito" he
arranges to transport.  BUZO also said that someone in the back
of the van was part of the organization, but did not know who.

### D.   Interviews of the Passengers

16.   HSI agents interviewed the passengers from the Amazon
Van to identify the individuals who were criminally responsible
for smuggling the passengers into the United States.

17.   HSI and United States Border Patrol ("USBP") agents
interviewed all five passengers with the assistance of a
translation service and agents who were fluent in Spanish.
Based on my conversations with those agents, I understand the
passengers stated the following:

a.   B.M.G. stated that he is from Oaxaca, Mexico,
does not have legal documentation to be in the United States,
and has never been removed from the United States.[2]  B.M.G.
stated that he arranged to pay approximately $10,000 USD to be
taken into the United States by foot.  B.M.G. stated that he
flew to Tijuana, Mexico on July 18, 2022, and was taken to a
small house in Tecate, Mexico.  At approximately 9:00 p.m., an
unknown man arrived and drove a group of approximately five men
to the border, where they were instructed to jump over the fence
and walk north.  B.M.G. stated that after walking through desert
for approximately three to four hours, the group was picked up

---

[2] Based on a records check, I know that B.M.G. has one voluntary
return from the United States in 2008.

by a van at approximately 7:00 a.m.[3]  B.M.G. estimated that the group drove for approximately five hours before stopping for gas, at which point a new driver entered the van.  B.M.G. described the driver as a tall, heavyset young man, approximately 22 years old, and stated that nobody in the group knew the driver.  B.M.G. was shown a lineup and identified BUZO as the second driver of the Amazon Van.  TARGET DEVICE 2 was previously taken from the person of B.M.G. by LASD.

b.   E.G.F. said that he is from Jalisco, Mexico, and is in the United States illegally.  He did not speak with anyone when he crossed into the United States because his phone (TARGET DEVICE 3) was on airplane mode.  E.G.F. explained that he jumped the wall, saw a car with an Amazon logo, and assumed it was waiting for him.  E.G.F. said that the person initially driving the car was skinny with curly hair, but he did not pay much attention to the driver because of adrenaline.  E.G.F. described the second driver as tall, heavy, and 30 years old or younger.  E.G.F. was shown a photo lineup and identified BUZO as the second driver.  E.G.F. did not know how long the original driver drove before switching and does not know what happened to the first driver or where they switched, only that it was at a gas station with an orange sign.

c.   J.M.F. said that he is from Guerrero, Mexico, and that he made arrangements with an unknown man in Mexico to enter the United States from Mexico on foot.  J.M.F. explained

---

[3] B.M.G. initially described the van as gray with an arrow on it, but later described it as blue.

that he could not see the smugglers because they were covering
their faces, but that one was tall and heavy and the others were
skinny.  J.M.F. said that he traveled in a Ford Silverado Truck.
Around midnight on July 19, 2022, he was dropped off near the
border in Tecate, Mexico, with approximately ten others.  When
he crossed into the United States, he met someone tall and
skinny with long hair waiting for him in the Target Van.  J.M.F.
initially said that he did not know when the drivers switched,
but later said that the van stopped for fuel at approximately
3:30 p.m., at which point a different driver entered the van and
drove it to Los Angeles.  The second driver was a heavy man,
about 32 years old, wearing glasses, who was neither tall nor
short.  J.M.F. was shown a photo lineup of six people and
identified BUZO as the driver when the Amazon Van was stopped by
law enforcement.  J.M.F. advised USBP that he has been
apprehended by USBP on numerous occasions for illegal reentry
and that on his previous attempt he was returned to Mexico
through Otay Mesa, California.  TARGET DEVICE 4 was taken from
the person of J.M.F. by LASD.

          d.   O.M.J. is from Oaxaca but lives in Tijuana,
Mexico and admitted to being in the United States illegally.
O.M.J. crossed the border by walking across by himself.  Once he
got across the border, he got in a large, brownish vehicle with
an unknown driver and drove straight to Los Angeles, where they
were caught.  O.M.J. said the group found him after he crossed.
O.M.J. explained that he wanted to come to the United States to
work as a strawberry harvester.  Someone named "Felipe" who

9

O.M.J. knows from Pachuca, Mexico was supposed to arrange a job for O.M.J. but did not provide him with the necessary papers. TARGET DEVICE 5 was taken from the person of O.M.J. by LASD. O.M.J. was shown a photo lineup and did not identify BUZO.

e.   M.H.H. admitted to being in the country illegally.  He explained that he crossed the border with seven to eight people from Tijuana, Mexico.  M.H.H. jumped a fence into the United States and a gray suburban truck came to pick him up.  M.H.H. did not recognize the driver, who yelled to get into the truck as M.H.H. and others were hiding in the brush. M.H.H. was in the truck for about three hours and did not think it stopped.  M.H.H. said he was lying down and never saw the driver.  He was shown a photo lineup and did not identify BUZO. TARGET DEVICE 6 was taken from the person of M.H.H. by LASD.

## IV.   TRAINING AND EXPERIENCE ON HUMAN SMUGGLING

18.   Based on my knowledge, training, experience, and information related to me from agents and others involved in human smuggling operations in California, operations to smuggle humans into the United States often involve the following:

a.   Smugglers who intend to bring humans into the United States bring humans to areas in Mexico near the United States-Mexico border.  The smugglers will often bring humans into the United States in vehicles or using foot guides to assist the group crossing on foot.

b.   Smugglers do not present smuggled humans for inspection at the United States-Mexico border.  Instead, smugglers often conceal humans within vehicles or attempt to

10

hide from USBP in the field in order to circumvent United States
immigration laws.

c.    After surreptitiously crossing the United States-
Mexico border in vehicles or on foot, human smugglers travel to
predetermined areas where the humans disembark from the vehicle
or move by foot into waiting vehicles called "load vehicles."

d.    Smugglers will often contact accomplices on the
U.S. side, who will inform them exactly where to direct the
undocumented humans to meet the load vehicles.

e.    Members of human smuggling operations often use
digital devices, including cell phones and GPS devices, to
communicate with one another in furtherance of those operations.
For example, foot guides and drivers smuggling humans from
outside the United States will often use digital devices,
including cell phones, to communicate with coconspirators to
determine the location of a designated pick up site or to learn
whether law enforcement officials are present.

f.    Similarly, members on the U.S. side involved in
smuggling humans will use digital devices, including cell
phones, to communicate with coconspirators involved in human
smuggling, to recruit other members, to coordinate travel and
meetings, to communicate with the vehicles transporting the
humans, and for other purposes connected with the human
smuggling operation.

g.    Human smugglers may also send photographs with
their digital devices to confirm that the humans are onboard the
vehicle, the location of the vehicle, or the arrival or

11

departure of the vehicle.   To send and receive such messages and photographs, human smugglers often use social media and other applications such as Facebook messenger, Snapchat, FaceTime, Skype, and WhatsApp.

       h.   Based on my training and experience, I believe that evidence of these smuggling arrangements will be found in the TARGET DEVICES.   Those involved in smuggling will often have communications in their digital devices with other co-conspirators, smugglers, and the smugglers' family and friends.

## V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

    19.   As used herein, the term "digital device" includes the TARGET DEVICES.

    20.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

       a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.   Normally, when a person deletes a file on a computer, the data contained in the file does not disappear, rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.   Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files, recently used tasks and processes, online nicknames and passwords in the form of configuration data stored by browser, email, and chat programs, attachment of other devices, times the device was in use, and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

13

21.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

22.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's

14

fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress the thumb and/or fingers of any of the owners of the TARGET DEVICES, and (2) hold any of the TARGET DEVICES in front of the witness from whom it was seized, with that person's eyes open to activate the facial, iris, and/or retina-recognition feature.

23.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. <u>CONCLUSION</u>

24. Based on the foregoing, there is probable cause to believe that BUZO committed a violation of 8 U.S.C. § 1324(a)(1)(A)(ii) (transporting aliens within the United States).

25. Further, there is probable cause to believe that the items to be seized described in Attachments B will be found in the TARGET DEVICES, as described in Attachment A.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this *21st* day of *July*, 2022.


_____
THE HONORABLE JACQUELINE CHOOLJIAN
UNITED STATES MAGISTRATE JUDGE

16